PINECROFT DEVELOPMENT, INC. vs. ZONING BOARD OF APPEALS OF WEST BOYLSTON, 101 Mass. App. Ct. 122

 
 PINECROFT DEVELOPMENT, INC. vs. ZONING BOARD OF APPEALS OF WEST BOYLSTON

101 Mass. App. Ct. 122
 February 10, 2022 - June 3, 2022

Court Below: Land Court
Present: Massing, Grant, & Walsh, JJ.

 

No. 21-P-523.

Zoning, Split lots, Zone boundary, Zoning district, By-law, Judicial review, Board of appeals: decision. Statute, Construction. Administrative Law, Agency's interpretation of statute.

In a civil action brought by the developer of a proposed four-unit dwelling (project) on a lot that was split between two different town zoning districts (one of which allowed multiunit dwellings and the other of which did not), this court reversed the judgment upholding the denial by the town's zoning board of appeals (board) of a building permit, where the board unreasonably interpreted the town's bylaw imposing a minimum lot area requirement for multiunit dwellings to displace the well-established rules governing split lots, in that the relevant dimensions of the project were to be measured in relation to the boundaries of the entire lot rather than the boundaries of the portion that permitted multiunit dwellings, and thus, the project complied with the minimum lot area required by the bylaw. [128-131]

Civil action commenced in the Land Court Department on October 27, 2020.

 The case was heard by Jennifer S.D. Roberts, J., on motions for summary judgment.

 George P. Kiritsy for the plaintiff.

 Jonathan G. Murray for the defendant.

 MASSING, J. In this appeal we revisit "the peculiar and often unanticipated problems arising in the management of 'split lots' -- single lots extending over two or more zoning districts." Tofias v. Butler, 26 Mass. App. Ct. 89, 92 (1988).

 The plaintiff, Pinecroft Development, Inc. (Pinecroft), applied for a building permit to construct a four-unit dwelling on a lot in the town of West Boylston that is split between a business zoning district (B district), where multiunit dwellings are allowed, and a single residence zoning district (SR district), where they are not. The town's zoning bylaw imposes a minimum "lot area" requirement 

 Page 123 

of 10,000 square feet per unit for multiunit dwellings. Although the property as a whole is greater than 40,000 square feet in area, the town's zoning board of appeals (board) denied the permit, reasoning that the bylaw prohibited Pinecroft from using area of the property situated in the SR district to meet the lot area requirement. Pinecroft sought judicial review under G. L. c. 40A, § 17. A Land Court judge, acting on cross motions for summary judgment, deferred to the board's application of the bylaw and affirmed the denial of the permit. Because we conclude that the board unreasonably interpreted the bylaw to displace the well-established rules governing split lots, we reverse.

 The legal landscape. To understand the board's interpretation of the bylaw, and to determine whether that interpretation is entitled to deference, it is necessary to survey the law pertaining to split lots. Where a single lot is divided by zoning district boundary lines, whether within the same municipality or across town lines, two general rules apply. First, we allow municipalities to strictly enforce zoning laws governing the "active" uses, Tofias, 26 Mass. App. Ct. at 95 -- such as commercial, industrial, residential, and variations thereof -- that are allowed within each district. This rule "is based on the principle that, ordinarily, a municipality ought to be accorded the right to carry out the policies underlying its zoning ordinance or by-law with respect to the actual uses made of land within its borders." Burlington Sand & Gravel, Inc. v. Harvard, 26 Mass. App. Ct. 436, 439 (1988).

 In application, this rule prohibits even active uses that are ancillary or accessory to a principal use: "[w]hether in the same or two different municipalities, if a lot is located in two different zoning districts, a town may prohibit the portion in one district from being used for an accessory use to serve a principal use not allowed in that district." Dupont v. Dracut, 41 Mass. App. Ct. 293, 295 (1996) (fourteen-unit housing project for elderly, permitted in Lowell portion of split lot but prohibited in Dracut portion, could not use Dracut portion for parking). See, e.g., Brookline v. Co-Ray Realty Co., 326 Mass. 206, 212 (1950) (portion of property in Brookline zoned as single residence could not be used for "carrying on the numerous inevitable service activities accompanying the occupancy of an apartment house" permitted on portion of property located in Boston). [Note 1]

 Page 124 

 Second, and somewhat conversely, where a proposed active use is permitted on the portion of a split lot located in a less restrictive district, the owner is permitted to count the area and boundaries of the part of the split lot located in the more restrictive district to fulfill dimensional requirements, such as lot size, frontage, setback, and density. See Tofias, 26 Mass. App. Ct. at 94 ("the use made of the area in the more restricted district to supply space for a yard or the like is, in itself, a use not inconsistent with the requirements of such a district"). The use of land in the more restrictive district solely to meet the dimensional requirements for an active use in the less restrictive district "is considered a permissible abstract or passive use." Boulter Bros. Constr. Co. v. Zoning Bd. of Appeals of Norfolk, 45 Mass. App. Ct. 283, 285 (1998). See Moore v. Swampscott, 26 Mass. App. Ct. 1008, 1009 (1988), quoting Tofias, supra at 95 ("the use of the land in the more restricted district must be merely 'abstract,' i.e., to satisfy the by-law, rather than 'an active, prohibited use of' the land in the more restricted district").

 Numerous cases illustrate the abstract or passive use of the portion of a split lot situated in one zoning district to satisfy the dimensional requirements for a structure to be built on the portion of the lot located in a different district. See, e.g., Tambone v. Board of Appeal of Stoneham, 348 Mass. 359, 363-364 (1965) (landowner who proposed to build apartment building could use portion of split lot located in district where apartment houses were prohibited to meet thirty-foot side yard setback requirement); Petrillo v. Zoning Bd. of Appeals of Cohasset, 65 Mass. App. Ct. 453, 460 (2006) (landowner proposing to build single-family home in Cohasset on lot crossing town and county lines into Scituate could count area located in Scituate to meet Cohasset's minimum lot size requirement); Boulter Bros. Constr. Co., 45 Mass. App. Ct. at 285 (landowner in Norfolk could include adjoining land in Millis to satisfy Norfolk's minimum lot size requirement); Dupont, 41 Mass. App. Ct. at 293-294 & n.2 (landowner could use frontage in Dracut, where active use was prohibited, to satisfy Lowell's frontage requirement); Moore, 26 Mass. App. Ct. at 1008-1009 (landowner lot could use land in district where only one-family residences were allowed to meet lot size and frontage requirements for two-family residence allowed 

 Page 125 

on other portion of lot). 

 The portion of a split lot in a more restrictive zoning district may be passively used to meet dimensional requirements for an active use permitted in a less restrictive district of the same lot even if the active use is prohibited in the more restrictive district. See, e.g., Dupont, 41 Mass. App. Ct. at 293-294 & n.2; Moore, 26 Mass. App. Ct. at 1009; Tofias, 26 Mass. App. Ct. at 90. The same is true even if stricter dimensional requirements for the active use apply in the more restrictive district. See Moore, supra. [Note 2] 

 Finally, municipalities may displace the general rules with specific provisions for split lots in their zoning laws. See Tofias, 26 Mass. App. Ct. at 96 n.14. For example, in Goldlust v. Board of Appeals of North Andover, 27 Mass. App. Ct. 1183, 1183-1184 (1989), we held that North Andover had displaced the general rule regarding dimensional requirements with a bylaw provision that required measuring setback from zoning boundaries rather than from lot boundaries. Application of the general rules would have required measuring setback from the lot line. See Tambone, 348 Mass. at 363-364; Goldlust, supra at 1183. See also Tambone, supra at 364 (noting provision in Stoneham zoning bylaw that permitted board of appeal to "grant an exception to permit limited extensions of 'a building or use' into an adjacent, more restricted district"); Boulter Bros. Constr. Co., 45 Mass. App. Ct. at 286-287 (holding that 1993 zoning amendment prohibiting land located outside town lines of Norfolk from being included in lot size calculations did not apply to preexisting lot). 

 Pinecroft's proposal and the board's decision. Pinecroft's property is an undeveloped parcel with a total ground area of 46,962 square feet. It straddles a boundary line between a B district and an SR district, with frontage on Woodland Street in 

 Page 126 

the B district and the rear of the property extending into the SR district. Under the zoning bylaw, construction of a four-unit dwelling is allowed as of right in a B district but is prohibited in an SR district. 

 While the bylaw does not contain a general provision for treatment of split lots, it does give owners of certain split lots a degree of relief from the strict application of zoning district boundary lines. Under section 2.4 of the bylaw, where a zoning district boundary line was superimposed over a preexisting lot, the bylaw regulations governing the less restrictive district (here, the B district) extend thirty feet into the more restrictive district (here, the SR district). [Note 3] Approximately one-half (23,000 square feet) of the property is situated in the B district, as extended thirty feet into the SR district by operation of section 2.4. Pinecroft proposed to build the four-unit dwelling entirely within this 23,000 square foot area. [Note 4] Under section 4.3.A of the bylaw, which requires a minimum of 10,000 square feet of "lot area" per dwelling unit, [Note 5] Pinecroft needed a total "lot area" of 40,000 square feet. Under the case law applying to split lots discussed above, Pinecroft could meet this dimensional requirement by the "abstract" use of the remaining portion of the property in the SR district. 

 The building inspector initially denied the application because "[p]art of [the] building will be in the single residence zone." He did not take section 2.4 into account in making his decision. Pinecroft appealed to the board, which denied the permit on a different basis -- because Pinecroft's proposal did not meet the "lot area" 

 Page 127 

requirement of section 4.3.A.

 To reach this conclusion, the board construed section 2.4 of the bylaw to prohibit owners of preexisting split lots from making any use of land more than thirty feet into the more restrictive portions of their lots -- regardless of whether that use is active or abstract -- to support a use permitted in the less restrictive portion of their lots. The board interpreted the term "regulations" in section 2.4 to "refer to both use regulations and dimensional regulations":

"Thus, both the use and dimensional regulations shall extend not more than thirty feet into the more restricted portion of the lot. To find otherwise would be to extend the regulations for the less restricted portion more than thirty feet into the more restricted portion of the lot. Such a finding would be contrary to the express language of [s]ection 2.4." 

So reasoning, the board determined that Pinecroft could count only the portion of the property located in the B district and the thirty-foot extension zone into the SR district toward meeting section 4.3.A's requirement of 10,000 square feet per dwelling for multiunit dwellings. Pinecroft could not make passive use of the other one-half of the property in the SR district toward that dimensional requirement. Counting only the 23,000 square feet located in the B district and the extension zone, the board determined that the property was not large enough to accommodate a four-unit dwelling: 

"[T]o allow four units to be built upon the approximately 23,000 total square feet of lot area in the [b]usiness district and extended by the thirty foot buffer area . . . would effectively reduce the '10,000 square feet for each dwelling unit' regulation to less than 6,000 square feet for each dwelling unit."

 Pinecroft sought judicial review of the board's denial of its building permit application in the Land Court. In a thoughtful and comprehensive memorandum of decision on the parties' cross motions for summary judgment, the Land Court judge reviewed the case law and accurately described the general rules and how they would apply to Pinecroft's proposal: 

"[T]he Appeals Court decisions creat[e] a distinction between active and 'abstract,' i.e., passive, use of the more restricted 

 Page 128 

lot and allow[] the area of the more restricted lot to be used for dimensional purposes . . . . In the absence of other considerations, Pinecroft would be entitled to use the area of the SR [d]istrict zoned portion of its lot to meet the B [d]istrict multi-unit lot size requirements."

The judge, however, identified section 2.4 of the bylaw as an "other consideration." Concluding that the board's interpretation of section 2.4 was entitled to deference, the Land Court judge affirmed the denial of the permit. [Note 6] 

 Review of board's decision. "[B]ecause the Land Court judge decided the case on cross motions for summary judgment, we give no deference to [her] decision. Instead, '[f]rom the same record as the motion judge, the reviewing court examines the allowance of summary judgment de novo.'" Albahari v. Zoning Bd. of Appeals of Brewster, 76 Mass. App. Ct. 245, 248 (2010), quoting Poon v. Massachusetts Inst. of Tech., 74 Mass. App. Ct. 185, 194 (2009).

 We review interpretations of zoning bylaws de novo and according to traditional rules of statutory construction. See Perry v. Zoning Bd. of Appeals of Hull, 100 Mass. App. Ct. 19, 21 (2021). "We first look to the language of the bylaw and, where that language is plain and unambiguous, we enforce the bylaw according to its plain wording." Plainville Asphalt Corp. v. Plainville, 83 Mass. App. Ct. 710, 712-713 (2013). If, however, terms are undefined or otherwise ambiguous, we will defer to a local zoning board's reasonable interpretation. See Perry, supra. An interpretation of a bylaw provision is unreasonable if it is inconsistent with that provision's purpose or the bylaw as a whole. See Valcourt v. Zoning Bd. of Appeals of Swansea, 48 Mass. App. Ct. 124, 129 (1999).

 The board's interpretation of section 2.4 to displace the general rules governing split lots rests on a shaky foundation. Although the bylaw does not define "regulations," the board's interpretation 

 Page 129 

of the term to include dimensional requirements is both inconsistent with the purpose of section 2.4 and prevents a harmonious reading of other bylaw provisions. [Note 7] Section 2.4 was intended to single out preexisting split lots, like Pinecroft's property, for special treatment: if the lot was held in single or joint ownership when the zoning districts dividing it were adopted, the lot's owner may actively use up to thirty feet of the more restricted portion for a purpose that is permitted in the less restricted portion. By contrast, developers who create split lots by combining multiple parcels from adjoining zoning districts cannot take advantage of the extension zone created by section 2.4. 

 But the board's interpretation turns this dynamic on its head. Because section 2.4 is limited to preexisting split lots, under the board's interpretation, newly created split lots would be able satisfy dimensional requirements under the generally applicable rule, as in Tofias, 26 Mass. App. Ct. at 93, [Note 8] whereas preexisting split lots that qualify under section 2.4 would be required to satisfy dimensional requirements under a more restrictive standard. Thus, a developer who today purchases a 23,000 square foot parcel in a B district and an adjoining 17,000 square foot parcel in an SR district, then consolidates them into a single lot, would be allowed to build the same project that Pinecroft was denied. An interpretation of section 2.4 that subjects owners of preexisting split lots to more stringent standards than owners of newly created split lots, when the bylaw's plain language demonstrates a clear intention to do the opposite, is unreasonable.

 In addition, the board's interpretation of section 2.4 cannot be read in harmony with section 4.3.A, which requires a minimum "lot area" of 10,000 square feet per unit. The term "lot area" in section 4.3.A cannot take on two different meanings, see DiCarlo v. Suffolk Constr. Co., 473 Mass. 624, 629-630 (2016), but that is 

 Page 130 

exactly what the board's interpretation of section 2.4 would require. For preexisting split lots subject to section 2.4, "lot area" would be the portion of the lot that permits multiunit dwellings, but for all other lots (including newly created split lots not subject to section 2.4), "lot area" would be the entire lot. The latter definition, which is consistent with common usage, should be applied uniformly to all lots in the town. See North Shore Realty Trust v. Commonwealth, 434 Mass. 109, 110-111 (2001); Perry, 100 Mass. App. Ct. at 24; Petrillo, 65 Mass. App. Ct. at 459; Boulter Bros. Constr. Co., 45 Mass. App. Ct. at 285. [Note 9] 

 Accordingly, the term "regulations" in section 2.4 must be construed as referring to the "use regulations" in section 3 and not to the "dimensional requirements" in section 4, consistent with the general rules for split lots. This construction does not render section 2.4 meaningless. For preexisting split lots, section 2.4 extends permitted active uses by thirty feet, but no more. Thus, Pinecroft may locate a four-unit dwelling on the property in the B zone and thirty feet into the SR zone, but it may not use the remaining portion of the property in the SR zone for any part of the dwelling or for ancillary uses, such as access roads or parking, associated with the dwelling.

 Indeed, Pinecroft must leave vacant the part of the property in the SR district more than thirty feet from the district boundary line. Owners of split lots (whether subject to section 2.4 or not) must choose between actively or passively using portions of their lots; they cannot do both. See Tofias, 26 Mass. App. Ct. at 96. Thus, Pinecroft's passive use of approximately 17,000 square feet in the SR district to satisfy the dimensional requirements for the four-unit dwelling precludes it from actively using that portion of the property for any other purpose. The result, as in Tofias, supra, "is to leave the land open, a degree of use less intensive than the residential development permitted by the zoning ordinance." Pinecroft's obligation to maintain the remainder of the property in the SR district as open space offsets its active use of the property in the B district and extension zone. See id., quoting Forest City, Inc. v. Payson, 239 A.2d 167, 169 (Me. 1968) ("In split-lot decisions of this character, we see . . . efforts at 'a compromise between the ordinance's apparent recognition of the value of regular zone boundaries and a desire to permit land 

 Page 131 

owners to enjoy the use of their entire properties as single units'").

 Conclusion. Under the general rules for split lots, the relevant dimensions of Pinecroft's project are measured in relation to the boundaries of the entire lot, not just the boundaries of the portion that permits four-unit dwellings. Because Pinecroft's entire lot is 46,962 square feet, and section 4.3.A of the bylaw requires only 40,000 square feet of lot area for four-unit dwellings, the proposed project complies with the minimum lot area requirement. And as the Land Court judge correctly ruled, Pinecroft may also use the extension zone as proposed for a portion of the building's foundation and exterior decks. See note 6, supra. The judgment is reversed, and the matter is remanded for entry of a new judgment reversing the decision of the board and directing the board to grant Pinecroft's building permit application.

 So ordered.

 Page 132 

Appendix.

FOOTNOTES
[Note 1] See also Beale v. Planning Bd. of Rockland, 423 Mass. 690, 694 (1996) ("Use of land in one zoning district for an access road to another zoning district is prohibited where the road would provide access to uses that would themselves be barred if they had been located in the first zoning district"); Burlington Sand & Gravel, Inc., 26 Mass. App. Ct. at 439-440 (same). 

[Note 2] Dicta in two of our decisions suggest that the application of the rule allowing passive use of more restricted property to meet dimensional requirements is limited to circumstances where "both zoning districts permit the proposed active use." Boulter Bros. Constr. Co., 45 Mass. App. Ct. at 285. See Petrillo, 65 Mass. App. Ct. at 460 n.13, citing Boulter Bros. Constr. Co., supra. This suggestion is erroneous, as demonstrated by Tofias, 26 Mass. App. Ct. at 90, and Moore, 26 Mass. App. Ct. at 1009, the two cases that the Boulter Bros. Constr. Co. decision cited for the proposition. As the Land Court judge trenchantly observed, "[Boulter Bros. Constr. Co.] misstates the facts of Tofias, which involved land in a residential A-2 district being used to calculate lot coverage for a commercial building being constructed in a limited commercial district, and of Moore, which involved land in an A-1 district that permitted single family residences being used to provide frontage and lot size to meet the requirements of an A-3 district permitting two-family residences." 

[Note 3] Section 2.4, titled "Lots in Two Districts," provides in full: 

"Where a district boundary line divided a lot in a single or joint ownership at the time such line is adopted, the regulations for the less restricted portion of such lot shall extend not more than thirty feet into the more restricted portion, provided the lot has a frontage on a street in the less restricted district." 

It is undisputed that the property was held in single or joint ownership when the town adopted the relevant zoning district boundary line.

[Note 4] A sketch of the property and the proposed structure is included as an Appendix to this decision. 

[Note 5] Section 4.3 of the bylaw, titled "Modifications to Dimensional Requirements," includes several subsections. Subsection A, "Multi-family Dwellings," reads in relevant part, "For multiple dwelling use, the minimum lot area shall be 10,000 square feet for each dwelling unit on lots where sewer service is available and permitted." Here, sewer service is available and permitted on the property. 

[Note 6] During the proceedings in the Land Court, the board took the position that section 2.4 allowed Pinecroft to make only passive use of the thirty-foot extension into the SR district, and that it prohibited Pinecroft from making active use of the extension zone for a portion of the building's foundation and exterior decks. The Land Court judge rejected the board's argument, noting that it was "contrary to the plain language of [section] 2.4." The board has abandoned its alternative reading of section 2.4 on appeal. Consequently, if Pinecroft is able to make passive use of the property more than thirty feet into the SR district to meet the "lot area" requirement, it is entitled to the permit as of right. 

[Note 7] It also has a tenuous connection to the plain language of the bylaw. Although the term "regulations" arguably could be construed to include everything in the bylaw, the bylaw in fact distinguishes between "use regulations" in section 3 and "dimensional requirements" in section 4 (emphasis added). 

[Note 8] In Tofias, 26 Mass. App. Ct. at 90, 93 & n.11, the city of Waltham's zoning ordinance had a provision nearly identical to section 2.4, but it did not apply to the lot in question, which had recently been assembled by purchases of three different parcels. Accordingly, the court applied the "more general considerations" from the case law, id. at 93, and permitted a landowner to passively use the area of its parcel in a residential district to meet lot coverage requirements for a commercial building to be located on the part of the parcel zoned for limited commercial uses, id. at 90-91, 96. 

[Note 9] Because section 2.4 and section 4.3.A do not conflict, the rule of statutory construction that "[t]he more specific statute or bylaw controls over the more general," Plainville Asphalt Corp., 83 Mass. App. Ct. at 713, has no application. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.